**Rachel MEHR, et al., Plaintiffs,**

v.

**FÉDERATION INTERNATIONALE DE FOOTBALL ASSOCIATION, et al., Defendants.**

**Case No. 14–cv–3879–PJH.**

United States District Court, N.D. California.

Signed July 16, 2015

Derek G. Howard, Jack Wing Lee, Minami Tamaki LLP, Sean Tamura–Sato, San Francisco, CA, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, Jon T. King, Hagens Berman Sobol Shapiro LLP, Berkeley, CA, for Plaintiffs.

Brad Karp, Bruce Birenboim, Daniel Levi, H. Christopher Boehning, Paul, Weiss, Rifkind, Wharton and Garrison LLP, New York, NY, Michael J. Shepard, Hogan Lovells US LLP, Stuart M. Gordon, Fletcher C. Alford, Gordon & Rees LLP, Julie Lynn Fieber, Wallace M. Tice, Lynch Gilardi & Grummer, San Francisco, CA, Russell Fredrick Sauer, Jr., Amy Christine Quartarolo, Casandra Leann Thomson, Latham And Watkins LLP, Los Angeles, CA, M. Christopher Hall, Bonne Bridges Mueller O'Keefe Nichols, Santa Ana, CA, for Defendants.

## ORDER GRANTING MOTIONS TO DISMISS

PHYLLIS J. HAMILTON, District Judge

Defendants' motions to dismiss the above-entitled action came on for hearing before this court on May 6, 2015. Plaintiffs appeared by their counsel Steve W. Berman, Derek G. Howard, and Jon T. King. Defendant Fédération Internationale de Football Association ("FIFA") appeared by its counsel Daniel H. Levi, H. Christopher Boehning, Michael J. Shepard, and Bruce Birenboim; defendant United States Soccer Federation, Inc. ("U.S.Soccer") appeared by its counsel Russell F. Sauer, Jr., Amy C. Quartarolo, and Casandra L. Thomson; defendant U.S. Youth Soccer Association ("USYSA") appeared by its counsel Margaret M. Holm and M. Christopher Hall; defendant California Youth Soccer Association ("CYSA") appeared by its counsel Wallace M. Tice; defendants National Association of Competitive Soccer Clubs, Inc. d/b/a U.S. Club Soccer ("US Club Soccer") and American Youth Soccer Organization ("AYSO") appeared by their counsel Stuart M. Gordon and Fletcher C. Alford; and

Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motions as follows.

## BACKGROUND

This proposed class action was filed on August 27, 2014 by seven soccer players, four of whom are under 17 years of age. The plaintiffs are Rachel Mehr ("Mehr"); R.K.I., by his mother Beata Ivanauskiene ("Ivanauskiene"); B.A., D.A., and I.A., by their mother Sarah Aranda ("Aranda"); L.L.M., by her mother Karen Christine O'Donoghue ("O'Donoghue"); and Kira Akka–Seidel ("Akka–Seidel"). R.K.I and Ivanauskiene live in Illinois, as do B.A., D.A., I.A., and Aranda. L.L.M. and O'Donoghue live in Colorado. Mehr and Akka–Seidel both live in Northern California.

Each of the seven plaintiffs is or was a member of a local soccer club in his/her community, and the claims asserted arise out of their participation in those local soccer clubs. Each of the local clubs is a member of a regional or state club or association, which is a member of a national youth organization, which is in turn a member of U.S. Soccer, the United States member of FIFA.

Plaintiffs assert claims against FIFA and five national or regional organizations that are engaged in promoting and sponsoring soccer, including youth soccer— U.S. Soccer, USYSA, CYSA, U.S. Club Soccer, and AYSO. Plaintiffs allege that "each of the defendants has failed to pro-

vide adequate concussion management." Cplt ¶ 29. They assert that defendants have failed to adopt and enforce rules that they claim would reduce "the risk" of preventable injuries resulting from concussions and repetitive heading, and they want the court to compel defendants to adopt and enforce rules that would reduce that risk. Cplt ¶ 28. They further allege that FIFA has failed to modify the FIFA "Laws of the Game" to provide proper protection from concussion injuries, as a result of its "strict rules about the number of players that can be substituted." Cplt ¶ 30.

Not all plaintiffs are suing all defendants. Mehr is suing FIFA, AYSO, USYSA, and U.S. Club Soccer. Cplt ¶ 38. Plaintiffs allege that Mehr resides in Novato, California, and that she played for "teams that were members of and governed by USYSA and U.S. Club Soccer" and played in "competitions hosted by USYSA and U.S. Club Soccer." Cplt ¶ 38. Ivanauskiene on behalf of R.K.I. is suing FIFA and USYSA. Cplt ¶ 41. Plaintiffs allege that R.K.I. has played soccer in Arlington, Illinois, for the past three years with the Young Sportsman's Soccer League, a member of the Illinois Youth Soccer Association, which is in turn a member of USYSA. Cplt ¶¶ 41, 42. Aranda on behalf of B.A., D.A., and I.A. is suing FIFA, U.S. Soccer, and AYSO. Cplt ¶¶ 44, 46. Plaintiffs allege that B.A., D.A., and I.A. have played AYSO soccer in De-Kalb, Illinois. Cplt ¶ 44. Akka–Seidel is suing FIFA, USYSA, and U.S. Soccer, Cplt ¶ 47, although plaintiffs assert in the opposition to U.S. Club Soccer's motion that it was "clearly an oversight" to fail to allege that Akka–Seidel was also suing U.S. Club Soccer. Plaintiffs allege that Akka–Seidel resides in Larkspur, California, and last competed in soccer during the 2013 season for the University of California at Santa Cruz, under the FIFA Laws of the Game, and that she also played for the Mill Valley Soccer Club (affiliated with USYSA and U.S. Club) and for the Tiburon Peninsula Soccer Club (affiliated with CYSA, USYSA, and U.S. Soccer). Cplt ¶ 47. Finally, O'Donoghue on behalf of L.L.M. is suing FIFA, U.S. Soccer, and AYSO. Cplt ¶ 50. Plaintiffs allege that L.L.M. played soccer for the Boulder Force Club in Colorado, a member of the Colorado Soccer Association, which is in turn a member of U.S. Soccer. Cplt ¶¶ 50–51. None of the plaintiffs alleges any claims against CYSA, although they assert in their opposition that this was "perhaps an oversight" and that it should have been "readily apparent" from the complaint that Mehr and Akka–Seidel intended to sue CYSA.

| | FIFA | US Soccer | USYSA | AYSO | US Club | CYSA |
|---|---|---|---|---|---|---|
| Mehr | x | | X | x | x | |
| R.K.I. | x | | X | | | |
| B.A. | x | x | | x | | |
| D.A. | x | x | | x | | |
| I.A. | x | x | | x | | |
| Akka-Seidel | x | x | X | | | |
| L.L.M. | x | x | | x | | |

Plaintiffs' claims are asserted on behalf of a proposed class, but as the court indicated at the hearing on the present motions, plaintiffs fail to make clear exactly whom they seek to represent. *See* May 6, 2015 Hearing Transcript ("5/6/15 Tr.") (Doc. 99) at 7–14. Plaintiffs do not limit the proposed class by location, age of players, status of players (professional or amateur—or within levels for amateur), or even reasonably by relevant time period, instead proposing a class period extending back more than 13 years from the date the complaint was filed, and a class including "[a]ll current or former soccer players" who, during that 13–year period, "competed for a team governed by FIFA, the United States Soccer Federation, U.S. Youth Soccer, American Youth Soccer Organization, U.S. Club Soccer, or California Youth Soccer Association." Cplt ¶ 415.

FIFA is based in Switzerland, and serves "as the governing body for soccer." Cplt ¶¶ 16, 19. The members of FIFA include U.S. Soccer and 208 other national soccer federations from around the world. Cplt ¶ 19. FIFA organizes a limited number of intercontinental soccer events (most notably the FIFA World Cup), but does not organize any soccer leagues or tournaments on any level, including in the United States. None of the plaintiffs or their local clubs is a member of—or has any direct relationship with—FIFA, and only U.S. Soccer (of the named defendants) is a FIFA member.

US Soccer is "the governing body of soccer in all its forms in the United States." Cplt ¶ 20; *see also* Cplt ¶ 72. US Soccer has a number of "affiliates" or "members consisting of youth, amateur, development, and professional leagues operating throughout the United States." Cplt ¶ 21. USYSA is an "affiliate" of FIFA and is "the largest member of" U.S. Soccer. Cplt ¶¶ 23, 77. In California, USYSA "affiliates" include CYSA. Cplt

¶ 23. US Club Soccer is "an organization devoted to the development and support of soccer clubs in the United States." Cplt ¶¶ 27, 85. AYSO is a "member" of U.S. Soccer. Cplt ¶ 25. US Soccer and U.S. Club Soccer oversee both youth and adult soccer, amateur and professional. USYSA, AYSO, and CYSA oversee youth soccer only.

Plaintiffs' 132–page complaint includes a lengthy section entitled "A Primer on Concussions," Cplt ¶¶ 94–132, which is followed by another lengthy section entitled "Consensus Best Practices for the Treatment of Concussions for the Period 2002–Present," Cplt ¶¶ 133–194. These "best practices" or "protocols" relate to concussion management and treatment, and allegedly were developed following or in conjunction with various international conferences, including four International Conferences on Concussion in Sport held in Vienna, Prague, and Zurich, starting in 2001. *See* Cplt ¶¶ 229–247. The complaint also quotes extensively from the FIFA "Statutes" regarding the objectives of FIFA, the "Laws of the Game," and the "Members' Obligations," and also quote various passages from FIFA's website, and from its "Medical Committee." *See* Cplt ¶¶ 195–218.

Plaintiffs assert that FIFA, U.S. Soccer, and USYSA have "knowledge of consensus best practices," but have "fail[ed] to adopt the consensus guidelines promulgated by the international conferences on concussion in sport." Cplt ¶¶ 229–260 (FIFA), ¶¶ 261–288 (U.S. Soccer), ¶¶ 289–317 (USYSA). They allege that prior to 2013, CYSA failed to "adopt any consensus guidelines promulgated by the international conferences on concussions in sport," and that its concussion protocol "still fails to adopt the consensus guidelines." Cplt ¶¶ 349–374. They assert that U.S. Club Soccer has failed to "adopt any consensus

guidelines promulgated by the international conferences on concussions in sport." Cplt ¶¶ 344–348. They claim that prior to 2009, AYSO failed to "adopt any consensus guidelines promulgated by the international conferences on concussions in sport," and that it has failed to adopt "consensus best practices." Cplt ¶¶ 318–343.

Plaintiffs allege that each of the defendants has failed to adopt "proper rules for protecting players under 17 from head injuries," Cplt ¶¶ 375–382; that FIFA has failed to adopt "proper substitution rules to allow athletes to be evaluated during a game," Cplt ¶¶ 383–407; that prior to the 2014 World Cup, plaintiffs and the class were "unaware that the conduct of FIFA may have caused them to be at increased risk of developing chronic brain injury symptoms, including but not limited to dementia and/or Alzheimer's disease and chronic traumatic encephalopathy," Cplt ¶¶ 408–414.

Plaintiffs assert three causes of action on their own behalf and on behalf of the members of the proposed class—(1) a claim of negligence; (2) a claim of "breach of voluntary undertaking" (of the duty to "supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to players"); and (3) a claim of "medical monitoring" (brought "under the laws of the states in which [plaintiffs] reside" and "under the laws of the states in which class members reside" although those states of residence are not specified except as to the named plaintiffs). Cplt ¶¶ 423–451.

Plaintiffs seek prospective injunctive relief. Cplt ¶¶ 432, 443. They also seek "medical monitoring" as a remedy for defendants' alleged negligence, Cplt ¶¶ 433, 444, and the establishment of a "medical monitoring program" funded by a trust fund to pay for "medical monitoring of all past, current, and future FIFA athletes, as frequently and appropriately as neces-

sary," and which will provide information to athletes and treating team physicians, Cplt ¶¶ 450, 451.

Before the court are (1) FIFA's motion to dismiss for lack of personal jurisdiction; (2) FIFA's alternative motion to dismiss or compel arbitration (joined by U.S. Soccer, USYSA, and CYSA); (3) FIFA's motion to dismiss for failure to join a necessary party (joined by U.S. Soccer, USYSA, and CYSA); (4) FIFA's motion to dismiss for lack of subject matter jurisdiction (joined by U.S. Soccer, USYSA, and CYSA), U.S. Soccer's motion to dismiss for lack of subject matter jurisdiction (joined by USYSA, CYSA, U.S. Club Soccer, and AYSO), CYSA's motion to dismiss for lack of subject matter jurisdiction (joined by U.S. Soccer), U.S. Club Soccer's motion to dismiss for lack of subject matter jurisdiction (joined by U.S. Soccer), and AYSO's motion to dismiss for lack of subject matter jurisdiction (joined by U.S. Soccer); and (5) FIFA's motion to dismiss for failure to state a claim (joined by U.S. Soccer, USYSA, and CYSA), U.S. Soccer's motion to dismiss for failure to state a claim (joined by USYSA, CYSA, U.S. Club Soccer, and AYSO), USYSA's motion to dismiss for failure to state a claim (joined by U.S. Soccer), CYSA's motion to dismiss for failure to state a claim (joined by U.S. Soccer), U.S. Club Soccer's motion to dismiss for failure to state a claim (joined by U.S. Soccer), and AYSO's motion to dismiss for failure to state a claim (joined by U.S. Soccer).

## A. Motion to Dismiss for Lack of Personal Jurisdiction

FIFA seeks an order dismissing the complaint for lack of personal jurisdiction, arguing that it is not subject to either general or specific jurisdiction in this court.

### 1. Legal Standard

When a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court may properly exercise jurisdiction over that defendant. *See Picot v. Weston*, 780 F.3d 1206, 1210 (9th Cir.2015); *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977). In resolving a motion to dismiss under Rule 12(b)(2) on written materials, the court accepts uncontroverted facts in the complaint as true and resolves conflicts in affidavits in plaintiff's favor. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir.2011); *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). Where the defendant's motion is based on a written record and no evidentiary hearing is held, the plaintiff need only make a prima facie showing of jurisdictional facts. *Picot*, 780 F.3d at 1210.

The Due Process Clause of the Fourteenth Amendment "limits the power of a state's courts to exercise jurisdiction over defendants who do not consent to jurisdiction." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1066 (9th Cir.2014). A district court sitting in diversity may exercise personal jurisdiction to the same extent as the courts of general jurisdiction of the state in which it is located. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir.2011). Because California's long-arm statute is "coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Id.* (quotations and citations omitted); see also Cal. Civ. P.Code § 410.10.

Due process requires that the defendant "have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Wash.*, 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quotations omitted). Under the "minimum contacts" analysis, a court can exercise either "general or all-purpose jurisdiction," or "specific or conduct-linked jurisdiction." *Daimler AG v. Bauman*, — U.S. —, 134 S.Ct. 746, 751, 187 L.Ed.2d 624 (2014) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, — U.S. —, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011)); *see Int'l Shoe*, 326 U.S. at 316–20, 66 S.Ct. 154.

### 2. FIFA's Motion

FIFA contends that it is not subject to either general or specific jurisdiction in California. Plaintiffs argue that the court has personal jurisdiction over FIFA, but also request leave to conduct jurisdictional discovery in the event the court finds no personal jurisdiction.

Under general jurisdiction, a nonresident defendant may be subject to suit even on matters unrelated to his/her/its contacts with the forum. *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 446, 72 S.Ct. 413, 96 L.Ed. 485 (1952); *see Daimler*, 134 S.Ct. at 754–58. To establish general jurisdiction, the plaintiff must demonstrate that the defendant has continuous and systematic contacts sufficient to approximate physical presence in the state. *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir.2013).

With regard to foreign corporations, the plaintiff must establish that the defendant corporation has "affiliations so continuous and systematic as to render [it] essentially at home in the forum State, ... *i.e.*, comparable to a domestic enterprise in that State." *Daimler*, 134 S.Ct. at 758 n. 11 (citation omitted); *see also Martinez*, 764 F.3d at 1066. The standard is a "demanding one." *Martinez*, 764 F.3d at 1070. The paradigm for a for the exercise of general jurisdiction over a corporation

are the place of incorporation and the principal place of business, and only in an "exceptional case" will general jurisdiction be available elsewhere. *Daimler*, 134 S.Ct. at 760–61 & n.19.

FIFA argues that plaintiffs cannot make a prima facie showing of general jurisdiction, because they cannot show that FIFA is "at home" in California. The court finds that FIFA has established that its contacts with California are not substantial enough to "approximate physical presence" in the state, and that under the standards articulated in *Daimler* and *Goodyear* it is therefore not subject to general jurisdiction.

It is undisputed that FIFA is a Swiss association registered in accordance with the Swiss Civil Code, and that its principal place of business is in Zurich, Switzerland; and that the only members of FIFA are national associations such as U.S. Soccer. FIFA provides undisputed evidence showing that it has no office, no mailing address, and no employees or subsidiary in California; that it maintains no bank accounts and pays no taxes in California, maintains no distribution or manufacturing facilities in California, and maintains no agent for service of process in California; and that it is not registered to do business in California.

In the complaint, plaintiffs allege that FIFA has numerous contacts with California, but on closer review, it becomes clear that those contacts primarily relate to commercial or quasi-commercial activities that are no more numerous in California than in any other state (or possibly elsewhere in the world). Indeed, FIFA's California contacts appear to be minor compared with its worldwide activities, and are certainly are not sufficient to render FIFA "essentially at home" in California. *See, e.g., Martinez*, 764 F.3d at 1070. Moreover, at the hearing on the present motion, plaintiffs' counsel conceded that the court

has no general jurisdiction over FIFA. *See* 5/6/15 Tr. at 22–23. Thus, the court turns to the question of specific jurisdiction.

A court may exercise specific jurisdiction over a defendant if his/her/its less substantial contacts with the forum gave rise to the claim or claims pending before the court—that is, if the cause of action "arises out of" or has a substantial connection with that activity. *Hanson v. Denckla*, 357 U.S. 235, 250–53, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); see *Goodyear*, 131 S.Ct. at 2854. The inquiry into whether a forum state may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation. *Walden v. Fiore*, —— U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014).

In the Ninth Circuit, specific jurisdiction is analyzed using a three-part test: First, the nonresident defendant must have purposefully directed his activities or consummated some transaction with the forum or a forum resident, or performed some act by which he purposefully availed himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; second, the claim must be one which arises out of or relates to the nonresident defendant's forum-related activities; and third, the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable. *See Picot*, 780 F.3d at 1211. If the plaintiff is successful at establishing the first two prongs, the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable. *Id.* at 1211–12.

The first prong of the test is analyzed under either a "purposeful availment" standard or a "purposeful direction" standard, which are two distinct concepts.

*Washington Shoe Co. v. A–Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012). Generally for claims sounding in contract, courts apply a "purposeful availment" analysis, asking whether the defendant has "purposefully avail[ed]" itself of "the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir.2004) (quoting *Hanson*, 357 U.S. at 253, 78 S.Ct. 1228); *see Picot*, 780 F.3d at 1212.

■■■■■■ For claims sounding in tort, courts generally apply a "purposeful direction" test, looking to evidence that the defendant has directed his actions at the forum state, even if those actions took place elsewhere. *Schwarzenegger*, 374 F.3d at 802–03. To establish purposeful direction, the plaintiff show that the defendant committed an intentional act, expressly aimed at the forum state, causing harm that the defendant knows is likely to be suffered in the forum state. *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir.2002) (citing *Calder v. Jones*, 465 U.S. 783, 788–89, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)). In some cases, the Ninth Circuit has limited the "purposeful direction" test to claims involving intentional torts. *See Holland America Line Inc. v. Wärtsilä North America, Inc.*, 485 F.3d 450, 460 (9th Cir.2007) ("[I]t is well established that the *Calder* [purposeful direction] test applies only to intentional torts, not to the breach of contract and negligence claims[.]"); *but c.f., Menken v. Emm*, 503 F.3d 1050, 1059 (9th Cir.2007) (applying *Calder* purposeful direction test to claims of negligence, wrongful interference with contractual relations, civil extortion, and fraudulent recording of document because they are all claims that sound in tort).

■■■■ Here, plaintiffs assert two causes of action—a claim of negligence, and a claim of "voluntary undertaking."[1] Because California law provides that recovery on a theory of negligent undertaking requires proof of the elements of any negligence cause of action, *see Artiglio v. Corning, Inc.*, 18 Cal.4th 604, 614–15, 76 Cal. Rptr.2d 479, 957 P.2d 1313 (1998), the purposeful availment standard provides the proper analysis (at least based on *Holland America* and its progeny).

FIFA asserts that it is not subject to specific jurisdiction in California under the three-part test. With regard to the first prong of the test, FIFA argues for application of the "purposeful direction" standard, and argues that plaintiffs cannot show that it purposefully directed its acts towards the residents of California. FIFA does not provide any discussion beyond asserting that the first prong of the test for specific jurisdiction requires a showing of purposeful direction.

Plaintiffs argue in their opposition brief that FIFA has performed numerous acts by which it purposefully availed itself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws, and that the allegations of these facts are sufficient to establish the first prong of the three-part test. Plaintiffs contend that FIFA requires its members, such as U.S. Soccer, to "follow FIFA's rules and the Laws of the Game" and also requires the members of its members (*i.e.,* U.S. Soccer's members) to follow those rules and laws. They also assert that Northern California has the largest concentration of youth soccer players in the country.

Plaintiffs argue further that FIFA has the power to influence individuals in Cali-

---

1. Plaintiffs also allege a third cause of action—a claim for "medical monitoring"— which as explained below is not a viable cause of action.

fornia and throughout the United States, "including consciously acting as a major influence on children in matters such as concussion related-issues." In particular, plaintiffs point to allegations in the complaint regarding the establishment of a "FIFA Medical Center of Excellence" in Santa Monica in 2007, pointing to materials on FIFA's website that extol the positive aspects of this sports medicine facility. Plaintiffs also contend that FIFA also has "authorized agents" in California, including in this judicial district, who operate as "match agents" to arrange matches between FIFA-sanctioned teams here and elsewhere. They claim that FIFA has numerous other contacts with California— including sponsoring the finals of the "FIFA Interactive World Cup of 2011"—a worldwide videogame presentation, as well as sponsoring videogame competitions in California at various times.

In addition, in the complaint, plaintiffs assert that FIFA engages in a variety of "commercial activities in the U.S. and California." The allegations generally relating to the United States are that a 2014 TV advertisement for Dick's Sporting Goods showed high school students using a FIFA-branded soccer ball, Cplt ¶ 56; that FIFA announced in 2005 that ABC and Univision had been awarded rights for all FIFA events from 2007 to 2014, Cplt ¶ 64; that Electronic Arts stated in a 2014 SEC filing that it had entered into a video-game licensing agreement with FIFA, Cplt ¶ 65; that FIFA-branded toys are sold at Toys–R–Us and in other stores "around the country," Cplt ¶ 66; that FIFA runs full-page ads for products directed at children, and advertises on Facebook, Twitter, and YouTube, Cplt ¶ 67; and that FIFA has an official online store, with a mailing address in North Carolina, which states that it welcomes orders from the "USA," Cplt ¶¶ 68–70. None of these allegations appears to have the remotest connection to

California, and thus are irrelevant for purposes of the personal jurisdiction analysis.

██ The allegations with some (tenuous) connection to California are that FIFA has "numerous licensing agreements" for products intended to be sold and distributed in California," Cplt ¶ 57; that Coca–Cola issued a press release in 2014 announcing that it was partnering with FIFA to bring the World Cup trophy to four cities in the United States including Los Angeles, Cplt ¶ 58; that in 2011, FIFA sponsored a worldwide videogame competition in California, Cplt ¶ 59; that in 2007, FIFA announced it was setting up "FIFA Medical Centres of Excellence" across all continents, and that it presented a doctor in California, with an "official accreditation certificate" for the Santa Monica Orthopaedic and Sports Medicine Group," Cplt ¶ 60; that in 2003, FIFA hosted the Women's World Cup in the United States, with one of the venues and "numerous matches" played in California, Cplt ¶ 61; that FIFA has filed copyright and trademark infringement suits in California and Oregon, Cplt ¶ 62; that FIFA has entered into broadcasting and advertising/branding agreements relating to the U.S. market, including the California market, Cplt ¶ 63; and that FIFA has "authorized agents" in the Northern District of California, including two in San Francisco, who allegedly have authority to arrange for "matches" between "FIFA-sanctioned teams," Cplt ¶ 71.

██ At best, plaintiffs have made a weak showing of purposeful availment. This requirement assures that a nonresident will be aware that it is subject to suit in the forum state, and that it can then take steps to limit the costs of litigation there or can sever its connections with the forum state. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The

foreseeability of causing injury in the forum state is not enough by itself to subject a nonresident defendant to jurisdiction there. *Id.* at 295, 100 S.Ct. 559; *see also Walden,* 134 S.Ct. at 1123. Rather, "the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum state is such that [it] should reasonably anticipate being haled into court there." *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559; *see also Walden,* 134 S.Ct. at 1122 (minimum contacts analysis "looks to the defendant's contacts with the forum state itself, not defendant's contacts with persons who reside there").

Here, the allegation that FIFA requires its members, such as U.S. Soccer, to "follow FIFA's rules and the Laws of the Game" and also requires the members of its members (*i.e.,* U.S. Soccer's members) to follow those rules and laws, even if true, could be said of almost any location in the United States. Even when combined with the fact that there are many youth soccer players in Northern California, this allegation is not sufficient to show that FIFA has availed itself of the privilege of conducting activities within California, such that it should have reasonably anticipated being haled into court in this state. Nor is the allegation that FIFA has the "power to influence individuals in California and throughout the United States" sufficient to show that FIFA has purposefully availed itself of the privilege of conducting activities in California, thereby invoking the benefits and protections of its laws. To find otherwise would be to suggest that FIFA is subject to personal jurisdiction everywhere in the United States where soccer is played.

The allegation that FIFA has provided the Director of the Santa Monica Orthopaedic and Sports Medicine Group an "official accreditation certificate, and that it announced an intention to set up "FIFA Medical Centres of Excellence" across "all continents" to assure that "all players have access to high quality football medicine" does not clearly establish a strong connection with California such that FIFA should have anticipated being haled into court to defend itself in this forum. FIFA provides evidence showing that there are more than 40 such independent centers across the globe, and that three are located in the United States. However, FIFA does not own the Santa Monica Medical Group, does not pay the salaries of its employees, and received no financial consideration for the accreditation.

Similarly, the allegations that FIFA has "agents" located in California who arrange matches between FIFA-sanctioned teams in California and "elsewhere," and that it has sponsored videogame competitions in California do not show that FIFA has purposefully availed itself of the privilege of conducting activities in California. FIFA has provided evidence showing that the match "agents" have no responsibility within FIFA and are not compensated by FIFA, and that their state of residence is irrelevant to the arranging of matches under license to FIFA.

The allegations that FIFA has entered into various commercial arrangements or agreements, while somewhat vague, do arguably support a finding of some low level of purposeful availment. However, the court finds it unnecessary to engage in a comprehensive analysis of the "purposeful availment" prong, because plaintiffs cannot satisfy the second prong of the specific jurisdiction test—that the claims asserted in the complaint arise out of or relate to FIFA's forum-related activities.

This prong requires a showing of "but for" causation—that is, a showing that the claims would not have arisen but for FIFA's contacts with the forum. *See Doe,* 248 F.3d at 924–25. Here, FIFA con-

tends, plaintiffs cannot show that their claims would not have arisen "but for" FIFA's contact with California. Indeed, FIFA argues, plaintiffs do not allege that their claims arise from any specific FIFA forum-related activity, and to the extent there are allegations regarding FIFA's contacts with California, they are limited to allegations relating to contacts of a commercial nature that are unrelated to claims based on FIFA's alleged failure to implement concussion-related protocols.

Nevertheless, plaintiffs assert in their opposition that their claims arise out of FIFA's California-related activities. They point to the allegation that FIFA "requires its members" (including U.S. Soccer) to follow FIFA's rules and the Laws of the Game; and to various documents in which FIFA has emphasized its worldwide role and influence, including in the area of "youth issues" and "medical issues." They also note that defendant AYSO is based in Torrance, California, and is bound to follow FIFA's rules. In addition, they assert, FIFA has "chosen" to locate its medical care, research and education center in Santa Monica, and identifies on its website a "medical committee," one of the members of which is located in Santa Monica. Finally, they claim that FIFA recently announced its intention to build a soccer facility in Carson, California.

The court finds that FIFA's motion to dismiss for lack of personal jurisdiction must be GRANTED. As plaintiffs have conceded that there is no general jurisdiction over FIFA, the only question is whether the court has specific jurisdiction. The gist of the jurisdictional allegations in the complaint is that FIFA "exerts mas-

sive worldwide influence and regulation over all aspects of soccer, including in the United States and in California[;]" that it "engages in a broad swath of commercial activities in the U.S. and in California, strategically reinforcing its 'brand' and its primacy in the world of soccer and entrenching its influence[;]" and that it "has extracted, and continues to extract, massive sums of money from the U.S. and California, and has not contributed to protecting the safety of the youth players to which it markets and influences." Cplt ¶ 56.

Plaintiffs have failed to show that their claims would not have arisen "but for" FIFA's contact with the forum. *See Doe*, 248 F.3d at 923–34. Plaintiffs seek an injunction compelling changes to the Laws of the Game to require enactment of concussion management protocols, mandate substitution rules that allow for medical evaluation without penalty, and mandate limits on heading—in practices and games—by players under 17. They also seek an order requiring FIFA to establish and fund medical monitoring programs, apparently for all youth soccer players in the United States. However, they never articulate how their claims would not have arisen "but for" the alleged contacts between FIFA and California. Nor can plaintiffs meet that standard, because none of the alleged contacts have anything to do with the implementation of concussion management protocols, or more generally with the enactment of the Laws of the Game by non-party International Football Association Board ("IFAB"), which is the only body with authority to enact or modify the Laws of the Game.[2]

---

**2.** As set forth in FIFA's motion to dismiss for failure to join a necessary party, the sole responsibility for the Laws of the Game lies with IFAB, a body that convenes once a year to discuss the Laws. IFAB is composed of FIFA (with four votes) and the four British associations (England, Scotland, Wales, and Northern Ireland) with one vote apiece). Thus, FIFA, with its four votes, cannot unilaterally modify the Laws. IFAB is a Swiss organization that does no business in the United States.

Plaintiffs point to the Santa Monica Sports Medicine Group, the existence of FIFA match agents, and FIFA's worldwide video game sponsorship as the primary bases for the court to find specific jurisdiction, they fail to explain how these activities relate in any way to their claims, which center on the theory that they are subject to a risk of concussions from playing soccer.

As for the Medical Centres, there are more than 40 such centers around the world (three in the U.S.) that have been accredited by FIFA. FIFA has provided evidence showing that it does not own, control, or operate the centers; that it does not pay the salaries of or provide benefits for the Santa Monica Centre's employees; that no FIFA employees work at the Santa Monica Centre; and that there is no financial consideration exchanged for the accreditation. The accredited institutions are totally independent of FIFA, and much of their work has nothing to do with FIFA or with soccer.

As for the match agents, the evidence shows that match agents are not employees or agents of FIFA—rather, they hold licenses that allow them to arrange matches between national teams or clubs from different confederations. Moreover, their location is irrelevant, as a match agent with an office in California can arrange matches anywhere. These agents have no responsibility within FIFA, or on behalf of FIFA in California. They are not compensated by FIFA, and have no authority to bind FIFA. They are responsible for obtaining their own professional liability insurance.

As for the other activities alleged in the complaint—the FIFA Interactive World Cup, the World Cup Trophy Tour, and the FIFA Development Committee—none of these activities are related to plaintiffs' claims in this lawsuit and thus plaintiffs cannot show that "but for" the contacts, their claims would not have arisen.

FIFA has provided evidence showing that it does not stage or organize any continental, national, regional, or local soccer matches in California, and that in the only alleged instances in which it has participated as an organizer of sport (the 2003 Women's World Cup), only 6 of 32 matches were played in California. However, the complaint alleges no facts showing that plaintiffs participated in those matches, that they were playing soccer at that time, and that their so-called injury (risk of concussions) would not have occurred but for FIFA's activity in the forum. Nor is the presence in California of one member of FIFA's medical committee, sufficient to confer specific jurisdiction over the claims in this case, as there are no allegations that plaintiffs' alleged injury would not have occurred "but for" that contact with California.

The court does not reach the third prong of the specific jurisdiction test— whether the exercise of jurisdiction would be reasonable—as the burden shifts to FIFA only if plaintiffs are able to satisfy the first two prongs of the test. *See Doe,* 248 F.3d at 925.

Finally, the court finds no basis for allowing plaintiffs to conduct jurisdictional discovery. A district court has "broad discretion" to permit or deny discovery to aid in determining whether it has personal jurisdiction. *See Butcher's Union Local No. 498 v. SDC Inv., Inc.,* 788 F.2d 535, 540 (9th Cir.1986); *see also Boschetto v. Hansing,* 539 F.3d 1011, 1020 (9th Cir.2008); *Data Disc,* 557 F.2d at 1285 n. 1. Discovery should ordinarily be granted where "pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub v. U.S. Dep't of*

*Interior,* 342 F.3d 1080, 1093 (9th Cir.2003) (citations omitted).

In this district, courts have generally held that "a plaintiff need not make out a prima facie case of personal jurisdiction before it can obtain jurisdictional discovery." *See, e.g., Corcera Sols., LLC v. Razor, Inc.,* 2014 WL 587869 at *2–3 (N.D.Cal. Feb. 14, 2014); *Calix Networks, Inc. v. Wi–Lan, Inc.,* 2010 WL 3515759, at *4 (N.D.Cal. Sept. 8, 2010). Where further discovery on an issue "might well" demonstrate facts sufficient to constitute a basis for jurisdiction, it is an abuse of discretion to deny it. *Harris Rutsky & Co. Ins. Serv. v. Bell & Clements,* 328 F.3d 1122, 1135 (9th Cir.2003).

However, denial of discovery "is not an abuse of discretion when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 430 n. 24 (9th Cir.1977); *see also Martinez,* 764 F.3d at 1070. "[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery." *Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1160 (9th Cir.2006) (quotations and citation omitted).

Plaintiffs concede that the court does not have general jurisdiction, yet the discovery they seek appears aimed almost entirely at establishing general jurisdiction—*e.g.,* information regarding business or potential business conducted by FIFA in California, including advertising, marketing, and sales; communications by FIFA employees with individuals in California; and training and seminars conducted by FIFA in California, attended by California residents. Nevertheless, independent of plaintiffs' concession, it is clear that plaintiffs cannot show that FIFA is "at home" in California, as it is a Swiss association with its principal place of business in Zurich, Switzerland, and has no employees, office, mailing address, agent for service of process, bank accounts, or distribution or manufacturing facilities in California, pays no taxes in California, and is not registered to do business in California. Thus, any discovery relating to FIFA's general commercial activities in California would be irrelevant to the issue of general jurisdiction.

Moreover, as explained above, plaintiffs provide no evidence supporting specific jurisdiction, let alone any "colorable basis," as they have not shown that their claims would not have arisen "but for" FIFA's contacts with California. Plaintiffs' request for jurisdictional discovery is premised on "little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto,* 539 F.3d at 1020. They have established no connection between any claim asserted in this case and any action by FIFA in California, and have provided no indication as to what discovery might possibly demonstrate facts sufficient to constitute a basis for jurisdiction.

### B. Motions to Dismiss for Lack of Subject Matter Jurisdiction

FIFA (joined by U.S. Soccer, USYSA, and CYSA) argues that the complaint should be dismissed for lack of Article III standing, because plaintiffs fail to allege facts showing injury-in-fact, causation, or redressability. In addition, U.S. Soccer (joined by USAYA, CYSO, U.S. Club, and AYSO), and CYSA, U.S. Club Soccer, and AYSO (all joined by U.S. Soccer) argue that plaintiffs lack standing to seek the relief requested in the complaint.

#### 1. Legal Standard

Federal courts are courts of limited jurisdiction, possessing only that

power authorized by Article III of the United States Constitution and statutes enacted by Congress pursuant thereto. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). Thus, federal courts have no power to consider claims for which they lack subject-matter jurisdiction. *See Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1415 (9th Cir.1992). The court is under a continuing duty to dismiss an action whenever it appears that it lacks jurisdiction. *Billingsley v. C.I.R.*, 868 F.2d 1081, 1085 (9th Cir.1989); *see also Spencer Enters., Inc. v. United States*, 345 F.3d 683, 687 (9th Cir.2003); *Attorneys Tr. v. Videotape Comput. Prods., Inc.*, 93 F.3d 593, 594–95 (9th Cir.1996).

■■■■ Standing is a jurisdictional limitation. It is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Arizona State Legislature v. Ariz. Indep. Redistricting Comm'n*, —— U.S. ——, 135 S.Ct. 2652, 192 L.Ed.2d 704, 2015 WL 2473452, at *8 (2015). Standing is not subject to waiver, and must be considered by the court even if the parties fail to raise it. *See United States v. Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). Each plaintiff bears the burden of establishing that he/she has standing for each claim and for each form of relief claimed. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006); *see also Hays*, 515 U.S. at 743, 115 S.Ct. 2431 (burden is on party seeking exercise of jurisdiction to "clearly ... allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute").

■■■■ To qualify as a party with standing to litigate, a plaintiff must show injury in the form of "invasion of a legally protected interest" that is "concrete and particularized" and "actual and imminent," and which is also "fairly traceable to the challenged action" and "redressable by a favorable ruling." *Arizona State Legislature*, 135 S.Ct. at 2663 (quotations and citations omitted); *see also Clapper v. Amnesty Int'l USA*, —— U.S. ——, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013); *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130.

### 2. Defendants' Motions

Defendants argue that plaintiffs do not meet the case-or-controversy requirement for Article III standing, because they fail to show an injury-in-fact that is fairly traceable to the conduct of a specific defendant, and which is redressable by the relief sought in the complaint, and fail to establish standing to seek the remedies of prospective injunctive relief and retrospective medical monitoring. In an alternative argument, defendants assert that California law disfavors judicial intervention into the rights and duties of private voluntary associations, and that this court accordingly should decline to exercise subject matter jurisdiction over this dispute.

With regard to the first factor, defendants contend that none of the seven plaintiffs alleges any present injury. One of the seven (L.L.M.) alleges that she suffered a single concussion in 2013, which was not caused by "heading" a ball. *See* Cplt ¶ 52. Each of the seven plaintiffs pleads a variation of a single allegation—that he/she is "at increased risk of latent brain injuries caused by repeated head impacts or the accumulation of concussive and/or subconcussive hits in [his/her] soccer career and therefore is in need of medical monitoring." *See* Cplt ¶ 40 (Mehr), ¶ 43 (R.K.I.), ¶ 46 (B.A., D.A., I.A.), ¶ 49 (Akka–Seidel), ¶ 52 (L.L.M.). Defendants argue that plaintiffs have failed to allege a fear of future injury that is immediate or direct, and that the allega-

tions in the complaint thus fail to satisfy the injury-in-fact requirement.

With regard to the second factor, defendants assert that the complaint alleges no facts showing even a weak causal connection between any act or omission by a specific defendant, and any particular injury to a specific plaintiff. Defendants also contend that while IFAB—a distinct entity that FIFA does not control—has the sole power to enact the Laws of the Game, the Laws of the Game can be modified (by regional or local leagues) in their application to youth and female players, and are flexibly implemented by each of soccer's governing bodies.

With regard to the third factor, defendants argue, first, that where a party necessary to afford the requested relief is not a party to the suit, a court decision cannot provide plaintiffs with the relief they seek. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. Thus, they assert, to the extent that plaintiffs are seeking an order altering the FIFA Laws of the Game, such relief is not available because the sole party with the power to implement changes to the Laws of the Game is IFAB, which is not subject to personal jurisdiction in California.

In addition, defendants assert that plaintiffs lack standing to seek either the remedy of prospective injunctive relief or the remedy of retrospective medical monitoring. With regard to prospective injunctive relief, they assert that six of the seven plaintiffs (Mehr, B.A., D.A., I.A., Akka–Seidel, and L.L.M.) do not allege that they are currently playing soccer or that they intend to play soccer, and that the seventh plaintiff (R.K.I.) has not alleged that he faces an imminent threat of harm that is not purely speculative or hypothetical; that the over–17 plaintiffs (Mehr, Akka–Seidel, and L.L.M.) are out of the age-range for seeking modifications to rules governing youth soccer; that the under–17 plaintiffs have not alleged facts showing

any imminent risk of injury that is fairly traceable to any defendant; that there is no justiciable controversy as to the Substitution Rule, as plaintiffs have conceded that the rule is inapplicable to them; and that the allegation that plaintiffs might suffer concussions in the future is too speculative to confer standing to seek implementation of concussion management protocols or rules. With regard to medical monitoring, defendants contend that none of the plaintiffs alleges any injury that is fairly traceable to defendants' conduct, for which medical monitoring could provide a remedy.

In opposition, plaintiffs assert that they have adequately alleged standing. They point to allegations that each plaintiff has played soccer on teams subject to the rules and control of various defendants, Cplt ¶¶ 38–39 (Mehr), ¶¶ 41–42 (R.K.I.); ¶¶ 44–45 (B.A., D.A., I.A.), ¶¶ 47–48 (Akka–Seidel), ¶¶ 51–51 L.L.M.); that each plaintiff has been "damaged by the actions and inactions of each of the [d]efendants," Cplt ¶ 54; that all plaintiffs "play soccer and are at risk due to [d]efendants' breaches [of duty]," Cplt ¶¶ 430, 441; that as a result of the actions and inactions of all defendants, all plaintiffs "have an improper risk of injury caused by the misconduct of the [d]efendants," Cplt ¶¶ 431, 442; and that each plaintiff "is at increased risk of latent brain injuries caused by repeated head impacts as well as the accumulation of concussive and subconcussive hits, particularly as minors, in their soccer careers and therefore is in need of medical monitoring," Cplt ¶¶ 40, 43, 46, 49, 51.

Plaintiffs contend that they have adequately pled both actual and "prospective" harm. They argue that defendants' suggestion that plaintiffs never headed a ball "strains plausibility" and ignores the allegations. They cite Cplt ¶ 52, where they allege that L.L.M. "was hit in the head

when someone kicked the ball and fell to the ground." They contend that "[t]he notion that [p]laintiff Seidel, a premier and college player, did not head the ball is non surgical [sic] to anyone who has watched the game."

Plaintiffs also complain that defendants are seeking to hold them to a heightened pleading standard, which standard they argue has been "rejected" by the Supreme Court. Plaintiffs assert that they are required to plead only a "short and plain statement of the claim" showing that they are entitled to relief, and that there is no requirement to plead injury resulting from defendants' conduct in any detail.

 The motion is GRANTED. Under *Lujan*, plaintiffs are required to allege an injury that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *See id.*, 504 U.S. at 560, 112 S.Ct. 2130. The injury alleged by the plaintiff must be "concrete in both a qualitative and temporal sense." *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *see also Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (plaintiff must show "real and imminent threat that he will be wronged again in the same way). Moreover, allegations of speculative or "possible future" injury do not satisfy the Article III requirement. *See id.* at 157–58, 110 S.Ct. 1717; *see also Clapper*, 133 S.Ct. at 1147.

 A plaintiff seeking injunctive relief satisfies the requirement of redressability by alleging facts showing that he/she is "realistically threatened by a repetition of the violation." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir.2006). Plain-

tiffs allege no facts showing that any of them is realistically threatened by a repetition of any violation. The facts showing standing must be clearly apparent on the face of the complaint. *Baker v. United States*, 722 F.2d 517, 518 (9th Cir.1983); *see also Schmier v. U.S. Court of Appeals*, 279 F.3d 817, 821 (9th Cir.2002) (party seeking to invoke jurisdiction of federal court must allege "specific facts sufficient to satisfy" the elements of standing). "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore*, 495 U.S. at 155–56, 110 S.Ct. 1717. "[S]tanding cannot be inferred argumentatively from averments in the pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).

 Here, the complaint is replete with vague and conclusory allegations of "injuries" and "harm" supposedly inflicted by "all defendants" on "all plaintiffs," but plaintiffs have alleged no *facts* showing that Mehr, R.K.I., B.A., D.A., I.A., or Akka–Seidel has been injured or is in any imminent danger of injury. Plaintiffs assert that each of the seven plaintiffs played youth soccer and is at "increased risk of latent brain injuries," having sustained "repeated head impacts" and/or "concussive" or "subconcussive hits" during his/her soccer "career," and is therefore in need of "medical monitoring." Cplt ¶¶ 40, 43, 46, 49, 52. Nevertheless, only L.L.M. is alleged to have suffered an actual concussion—on one occasion—and even here, plaintiffs have not alleged any facts showing that L.L.M. is in imminent danger of injury, as they assert the same vague and conclusory allegation with regard to L.L.M. as with regard to the other six plaintiffs. *See* Cplt ¶ 52. As pled in the complaint, the alleged "risk" of latent brain injuries is speculative and nebulous,

rather than being "certainly impending" such that it constitutes a real and immediate injury-in-fact. *See Whitmore*, 495 U.S. at 158, 110 S.Ct. 1717.

■ As for plaintiffs' frivolous argument that defendants are improperly seeking to impose a "heightened pleading standard," and that they are not required to plead injury resulting from defendants' conduct in any detail, the court notes that *Lujan*, which plaintiffs cite in support of this argument, clearly holds that because the elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," each of those elements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.* at 561, 112 S.Ct. 2130. Thus, at the pleading stage, plaintiffs are required to allege the elements of standing with at least as much specificity as is required in pleading the elements of a cause of action. *See Perez v. Nidek Co., Ltd.*, 711 F.3d 1109, 1113 (9th Cir.2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

The complaint is jurisdictionally defective for the further reason that plaintiffs have alleged no facts showing any causal connection between the conduct of any specific defendant and any alleged injury to a particular plaintiff. Even as to the one plaintiff (L.L.M.) alleged to have sustained a concussion, plaintiffs allege no facts showing that any defendant was responsible for L.L.M.'s concussion or was even made aware of it. Nor do plaintiffs allege any facts showing that the vaguely described "repeated head impacts" and/or "concussive" or "subconcussive hits" suffered by any particular plaintiff were the result of some action taken by a particular defendant.

Finally, the court finds that plaintiffs have not alleged facts sufficient to demonstrate redressability. Plaintiffs seek an injunction requiring defendants to draft and adopt unspecified concussion management protocols and to change the rules by which soccer is played. They also seek creation of a monetary fund of unspecified size to pay for medical monitoring of some untold number of players and former players in the United States and perhaps worldwide who fall within the proposed class as defined in the complaint. Defendants argue that plaintiffs lack Article III standing to seek either prospective injunctive relief or retrospective relief in the form of medical monitoring.

■ As stated above, each plaintiff bears the burden of establishing that he/she has standing for each claim and for each form of relief claimed. *See Daimler-Chrysler*, 547 U.S. at 352, 126 S.Ct. 1854. Essentially, the analysis of whether plaintiffs have standing to seek the remedies they seek collapses into the analysis of redressability, which requires that plaintiff show that it is likely, as opposed to merely speculative, that his/her injuries can be redressed by a favorable ruling from the court. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130; *see Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

It is not entirely clear what prospective injunctive relief plaintiffs are seeking. In the portion of the complaint entitled "Introduction," plaintiffs assert that they are seeking, on behalf of themselves and the broadly-defined class of "all current or former soccer players" who at any time from 2002 to the present, played soccer for a team "governed by" FIFA, U.S. Soccer, USYSA, AYSO, or U.S. Club, an injunction requiring each defendant to "(1) mandate the enactment and enforcement of proper concussion-management practices and return-to-play guidelines; (2) mandate substitution rules that allow for medical evalu-

ation without penalty; and (3) mandate limits on heading by players under 17." Cplt ¶ 32.

In the portion of the complaint entitled "Parties," plaintiffs assert that they seek "class-wide injunctive or equitable relief in the form of changes to [FIFA, U.S. Soccer, USYSA, U.S. Club Soccer, and AYSO] rules and practices with respect to concussion management, return-to-play guidelines, and limitations on heading in order to meet the consensus best practices" allegedly outlined elsewhere in the complaint. Cplt ¶ 40 (Mehr), ¶ 43 (R.K.I.), ¶ 46 (B.A., D.A., I.A.), ¶ 49 (Akka–Seidel), ¶ 53 (L.L.M.).

In the allegations supporting the first and second causes of action, plaintiffs assert that they are entitled to "injunctive relief requiring each Defendant, among other things, to adopt corrective measures regarding: the implementation of system-wide 'return to play' guidelines for the screening and detection of head injuries; failing to implement substitution Rules for medical evaluation purposes and failing to regulate heading by players under 17." Cplt ¶¶ 432, 443.

The court's best guess prior to the hearing on the present motions was that plaintiffs, on behalf of the class as defined in the complaint, were seeking modifications to the FIFA Laws of the Game to limit the number of player substitutions permitted ("the FIFA Substitution Rule"), unspecified "changes" to organization "rules and practices with respect to concussion management [and] return-to-play guidelines," and changes to rules that allow "heading," with a goal of imposing some "limitations on heading" by players younger than 17; and that they were also seeking implementation of a program of medical monitoring for themselves and all class members.

At the hearing, plaintiffs' counsel for the first time indicated that plaintiffs were seeking the prospective injunctive relief in the form of changes to the substitution rules, concussion management and return-to-play guidelines, and restriction or elimination of heading *only* with respect to players under 17, and were seeking the retrospective medical monitoring for all individuals who had ever played soccer under the auspices of one of the defendant organizations at any time since 2002. 5/6/15 Tr. at 72–74. However, with specific regard to changes to heading rules, plaintiffs' counsel also stated, "14 to 17 we don't seek [to] ban heading at all, the basic limitation on how much you hit" and that they were seeking "potentially, again based on discovery, that there be no heading perhaps under age 14, or that it be limited, there can be a limited number of times you can hit." 5/6/15 Tr. at 71.

As an initial matter, to the extent that plaintiffs seek injunctive relief in the form of an order directing changes to the FIFA Laws of the Game, such relief is unavailable because the only entity with the authority to change the Laws of the Game is IFAB, a Swiss organization that is not a party to this action, and over which the court would not have personal jurisdiction even were it named as a defendant.

Further, none of the plaintiffs alleges that he/she faces an imminent threat of irreparable harm that is not purely speculative or hypothetical. Plaintiffs appear to have conceded that they lack standing with regard to the modification to the FIFA Substitution Rule. None of the plaintiffs alleges that he/she currently plays for, has ever played for, or otherwise intends to play for a youth organization that enforces the Substitution Rule. In light of plaintiffs' counsel's statement at the hearing that plaintiffs are seeking prospective injunctive relief only as to players of youth soccer, plaintiffs' concession in the complaint that "the FIFA substitution rule is not

followed at the youth level" dooms that part of the claim. *See* Cplt ¶ 383.

As for implementation of system-wide concussion management and return-to-play guidelines, and the restrictions on heading by players younger than 17, plaintiffs have also not established that they have standing to seek those forms of relief. Six of the seven plaintiffs alleged they "played" soccer, not that they currently play soccer. *See* Cplt ¶ 38 (Mehr), ¶ 44 (B.A., D.A., I.A.), ¶ 47 (Akka–Seidel), ¶ 50 (L.L.M.). Moreover, three of the seven plaintiffs (Mehr, Akka–Seidel, and L.L.M.) are 17 or older, and thus are out of age-range for rule changes pertaining to youth soccer.

Most importantly, however, none of the plaintiffs have standing to seek an order compelling adoption of the "Consensus Statement" or "best practices" recommendations as defined by plaintiffs, because the assertion that they might suffer concussions in the future and that such concussions might be exacerbated in the absence of their proposed concussion management protocols does not show any "real and imminent threat" of a repetition of an alleged violation and is thus too speculative to confer standing. No plaintiff that does not claim to have suffered a concussion can seek to hold defendants liable for any alleged failure to implement plaintiffs' proposed concussion management protocols, let alone for returning him/her to play despite the awareness of his/her condition by an individual affiliated with a particular defendant.

Finally, plaintiffs lack standing to impose limits on heading, even as to those players who are under 17, because they do not allege that they suffered injury as a result of heading or attempting to head a soccer ball. (Based on counsel's statements at the hearing, it appears that plaintiffs are not seeking limits on heading for any players 14 and older.) Moreover, none of the plaintiffs alleges that he/she ever engaged in repetitive heading, much less engaged in it at the levels plaintiffs speculate may be later determined to cause injury.

In the absence of allegations that each plaintiff engaged in repetitive heading of a soccer ball or was returned to play prematurely after suffering a concussion (the symptoms of which were made evident to an individual affiliated with a defendant), plaintiffs have failed to meet their burden of establishing standing to challenge any failure by defendants to restrict heading or any alleged failure to implement concussion management protocols.

 With regard to retrospective medical monitoring, none of the plaintiffs has standing to seek this form of relief because none alleges that he/she suffered an actual injury that is fairly traceable to defendants' challenged conduct, for which medical monitoring could provide a remedy. A plaintiff seeking the remedy of medical monitoring in California must show "that the need for future monitoring is a reasonably certain consequence of the plaintiff's toxic exposure and that the recommended monitoring is reasonable." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 974, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993).

Here, one plaintiff (L.L.M.) claims to have suffered a concussion, but the complaint presents this concussion as a one-time event, the symptoms of which have fully resolved, and plaintiffs have alleged no facts showing that L.L.M. sustained any injury that gives rise to a need for medical monitoring. Nor do plaintiffs allege that any individual affiliated with any specific defendant was aware that L.L.M. was exhibiting symptoms of concussion, or that the concussion was exacerbated by defendants' alleged lack of sufficient concussion management protocols (or that it was caused by "heading" a ball).

■ Finally, the court finds it unnecessary to rule on defendants' alternative proposal that the court decline to exercise subject matter jurisdiction under a theory of abstention. The court notes that in general, abstention (of any sort) is the exception and not the rule. *See Colorado River Water Conserv. Dist. v. United. States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *see also Chula Vista Citizens for Jobs & Fair Competition v. Norris,* 782 F.3d 520, 528 (9th Cir.2015). Also, given the lack of facts to support the claims, the court would be reluctant to find that it should abstain on the ground argued by defendants.

### D. Motion to Dismiss for Failure to State a Claim

FIFA (joined by U.S. Soccer, USYSA, and CYSA) seeks an order dismissing the complaint for failure to state a claim, as do U.S. Soccer (joined by USYSA, CYSA, U.S. Club Soccer, and AYSO), USYSA (joined by U.S. Soccer), CYSA (joined by U.S. Soccer), U.S. Club Soccer (joined by U.S. Soccer) and AYSO (joined by U.S. Soccer).

#### 1. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.,* 349 F.3d 1191, 1199–1200 (9th Cir.2003). Review is generally limited to the contents of the complaint, although the court can also consider a document on which the complaint relies if the document is central to the claims asserted in the complaint, and no party questions the authenticity of the document. *See Sanders v. Brown,* 504 F.3d 903, 910 (9th Cir.2007). To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2)

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. *Somers v. Apple, Inc.,* 729 F.3d 953, 959 (9th Cir.2013). While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. *Iqbal,* 556 U.S. at 678–79, 129 S.Ct. 1937; *see also In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir.2008).

The allegations in the complaint "must be enough to raise a right to relief above the speculative level[,]" and a motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 558–59, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations and quotations omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679, 129 S.Ct. 1937. Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment. *Sparling v. Daou,* 411 F.3d 1006, 1013 (9th Cir.2005).

#### 2. Defendants' Motions

All seven defendants seek an order dismissing the complaint, arguing that plain-

tiffs fail to state a claim as to any of their three causes of action, each of which is brought on behalf of "[p]laintiffs and the class."

### a. Negligence

As pled, the first cause of action for negligence does not present a coherent legal claim. First, plaintiffs allege that "each defendant" acted negligently in its position as a regulatory body for soccer and soccer players, including plaintiffs and the members of the class. Cplt ¶ 425. Next, plaintiffs assert that FIFA and U.S. Soccer "knew or should have known that their actions or inactions in light of the rate and extent of concussions reported and made known to FIFA and U.S. Soccer would cause harm to players in both the short-and long-term[;]" Cplt ¶ 425; and that they "knew that through the power of the Laws of the Game they had the power to direct and influence how the rest of the defendants treat concussion management issues[,]" Cplt ¶ 426. Added to this, they assert that the "non-FIFA and U.S. Soccer [d]efendants had an independent duty to enact and enforce Laws of the Game that properly protect players." Cplt ¶ 427.

Plaintiffs allege further that "[e]ach [d]efendant was careless and negligent by breaching the duty of care it assumed for the benefit of the [p]laintiffs and the Class, both generally and in the following particular respects"—in failing to educate players and their parents concerning symptoms that may indicate a concussion has occurred; in failing to warn of the risk of unreasonable harm (including long-term complications and cognitive decline) resulting from repeated concussions and return-to-play, the accumulation of subconcussive hits, and heading; in failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and accumulation of subconcussive hits; and in concealing and misrepresenting pertinent facts that players and parents need-ed to be aware of to make determinations of the safety of return to play. Cplt ¶ 428.

They add that "[i]t was reasonable and foreseeable to FIFA and U.S. Soccer that their failures would flow downstream to the Rules and Laws of the Game enacted by other organizations, including the other [d]efendants in this action." Cplt ¶ 429. Finally, they allege that "[a]s a result of the foregoing, the [p]laintiffs and the Class have an improper risk of injury caused by the misconduct of the [d]efendants." Cplt ¶ 430.

Defendants contend that the negligence claim must be dismissed because plaintiffs have not pled facts sufficient to show either a breach of a legally cognizable duty, or causation. As for the alleged failure to implement the recommendations or guidelines in the Consensus Statements, defendants argue that none of them have a relationship with plaintiffs such that they would be under any duty to enforce those recommendations or guidelines. In addition, they note that the Consensus Statements state they are not intended to be a standard of care, and argue that in the absence of a legal duty owed to plaintiffs, plaintiffs cannot establish that any duty was breached.

As for the alleged duty to prevent risks of concussions and other injuries, defendants assert that under the rule stated by the California Supreme Court in *Knight v. Jewett*, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696 (1992), there is no duty to prevent risks that are inherent in a sport, but rather only a duty not to increase the risks to a participant over and above those inherent in the sport. Defendants note that plaintiffs allege elsewhere in the complaint that "[i]njuries are an unfortunate part of soccer" (and thus, presumably, an "inherent" risk); that at least 30% of concussions in soccer are caused by "heading the ball," or "attempting to head the ball and collid-

ing with a player, object, or the ground," and that "[p]urposefully heading the ball is a legal and encouraged maneuver" in soccer. *See* Cplt ¶¶ 2, 6, 12.

Defendants argue that plaintiffs have alleged no facts showing that any defendant has done anything to increase the risks of the sport beyond those already inherent in the game. Moreover, defendants assert, because there are no allegations showing any connection between any actions taken by any specific defendant and any injury suffered by any plaintiff, plaintiffs have failed to plead that any action by any defendant is the proximate cause of plaintiffs' alleged injuries.

In their opposition to defendants' motion, plaintiffs complain that defendants have "strayed away from the dominant theme of the [c]omplaint," which plaintiffs characterize as the claim that defendants have "failed to enact and enforce best practices for concussion management." According to plaintiffs, "[t]his is an issue about what happens after a concussion or likely concussion occurs." Plaintiffs claim that defendants are missing the point when they cite "inapposite cases solely focusing on an activity itself, not medical care issues that occur after the activity."

■■■ The court finds that the motion must be GRANTED. The elements of a claim of negligence under California law are (1) duty; (2) breach; (3) causation; and (4) damages. *Wells Fargo Bank, N.A. v. Renz*, 795 F.Supp.2d 898, 924–25 (N.D.Cal.2011) (citing *Ileto*, 349 F.3d at 1203). As pled, the first cause of action alleges no facts showing that any defendant breached any legal duty of care owed to any plaintiff.

■■■ The existence of a legal duty is the threshold element of a cause of action for negligence. *Friedman v. Merck & Co.*, 107 Cal.App.4th 454, 463, 131 Cal.Rptr.2d 885 (2003). Whether this essential prerequisite to a negligence cause of action has

been satisfied in a particular case is a question of law to be resolved by the court. *Avila v. Citrus Comty. Coll. Dist.*, 38 Cal.4th 148, 161, 41 Cal.Rptr.3d 299, 131 P.3d 383 (2006); *Artiglio*, 18 Cal.4th at 614, 76 Cal.Rptr.2d 479, 957 P.2d 1313. As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. *See Rowland v. Christian*, 69 Cal.2d 108, 112–13, 70 Cal. Rptr. 97, 443 P.2d 561 (1968); Cal.Code § 1714. A duty of care may arise through statute, contract, the general character of the activity, or the relationship between the parties. *The Ratcliff Architects v. Vanir Constr. Mgmt., Inc.*, 88 Cal.App.4th 595, 604–05, 106 Cal.Rptr.2d 1 (2001) (citing *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 803, 157 Cal.Rptr. 407, 598 P.2d 60 (1979)).

■■■ In California, the controlling case on the existence of legal duty in the sports context—where "conditions or conduct that might otherwise be viewed as dangerous often are an integral part of the sport itself"—is *Knight v. Jewett*. In that case, the California Supreme Court held that there is no duty to prevent risks that are "inherent in the sport itself," and that the duty owed by a defendant depends on the defendant's role or relationship to the sport. *Id.*, 3 Cal.4th at 317–18, 11 Cal. Rptr.2d 2, 834 P.2d 696. While the issue in *Knight* was the proper duty of care governing the liability of a sports participant for an injury to a co-participant, the general principle is applicable to determining the existence of a duty of care here.

Indeed, courts have applied the doctrine to defendants who were not co-participants, such as ski resort operators, *see Connelly v. Mammoth Mt. Ski Area*, 39 Cal.App.4th 8, 12–14, 45 Cal.Rptr.2d 855 (1995) (resort operator had no duty to pad ski lift tower because collisions with ski lift towers, other skiers, and snow-making

equipment are inherent risks of the sport); and baseball league organizers, *see Balthazor v. Little League Baseball, Inc.*, 62 Cal. App.4th 47, 51, 72 Cal.Rptr.2d 337 (1998) (Little League owed no duty to player to provide special safety equipment to guard against being struck by wild ball, because that is inherent risk of sport).

■ Here, plaintiffs have acknowledged that "injuries" are a "part of soccer." *See* Cplt ¶ 2. They have also conceded that "heading," which they claim causes at least 30% of the concussions in soccer—thus, by implication, also conceding that 70% of concussions are due to some other cause—is "a legal and encouraged maneuver" in soccer. *See* Cplt ¶¶ 6, 12. A defendant has no duty to protect a plaintiff against risks inherent in a particular sport voluntarily played by the plaintiff, since those who participate in a sporting activity that poses an inherent risk of injury generally assume the risk that they may be injured while doing so. *See Lackner v. North*, 135 Cal.App.4th 1188, 1197–99, 37 Cal.Rptr.3d 863 (2006). ·

■ Under California law, "a failure to alleviate a risk cannot be regarded as tantamount to increasing that risk." *Paz v. State of California*, 22 Cal.4th 550, 560, 93 Cal.Rptr.2d 703, 994 P.2d 975 (2000). Plaintiffs have alleged no basis for imputing to any defendant a legal duty to reduce the reduce the risks inherent in the sport of soccer, or to implement any of the "Consensus Statement" guidelines or concussion management protocols, and have alleged no facts showing that any defendant took any action that increased the risks beyond those inherent in the sport.

■ In addition, to plead actual or legal causation, a plaintiff must allege facts showing that the defendant's act or omission was a substantial factor in bringing about an injury suffered by the plaintiff. *See Saelzler v. Advanced Grp.*, 25 Cal.4th 763, 778, 107 Cal.Rptr.2d 617, 23 P.3d 1143

(2001). In this case, however, plaintiffs have alleged no facts showing that any plaintiff suffered any injury—including a concussion—as a result of an allegedly negligent act by any defendant. Rather, the gist of plaintiffs' negligence claim is that in failing to promulgate rules and regulations relating to concussion management, each defendant "breached the duty of care it assumed for the benefit" of each of the plaintiffs, with the result that plaintiffs "have an improper risk of injury due to [d]efendants' breaches." As stated above in the discussion of the motion to dismiss for lack of subject matter jurisdiction, the allegations of injury are vague, conclusory, and entirely speculative, rather than concrete and particularized, and just as those allegations are insufficient to establish plaintiffs' entitlement to sue, they are insufficient to support a cause of action for negligence.

### b. Voluntary undertaking

In the second cause of action cause of action for voluntary undertaking, plaintiffs assert that "each [d]efendant voluntarily assumed a duty toward [p]laintiffs and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players." Cplt ¶ 435. They assert that each defendant was negligent in breaching its "assumed and voluntary duty of due care for the benefit of [p]laintiffs and the Class," both generally and by failing to educate players and their parents concerning symptoms that may indicate a concussion has occurred; in failing to warn of the risk of unreasonable harm (including long-term complications and cognitive decline) resulting from repeated concussions and return-to-play, the accumulation of subconcussive hits, and heading; in failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and accumulation of subcon-

cussive hits; and in concealing and misrepresenting pertinent facts that players and parents needed to be aware of to make determinations of the safety of return to play. Cplt ¶ 439.

Defendants contend that the second cause of action fails to state a claim because plaintiffs have pled no facts showing that any defendant voluntarily assumed a duty with regard to the subject matter of the complaint. US Soccer, USYSA, AYSO, and U.S. Club Soccer each filed a motion (as did CYSA, against which no claim is asserted by any plaintiff in the case), and U.S. Soccer, USYSA, AYSO, and U.S. Club also each join in FIFA's motion to dismiss, which the court does not specifically discuss here because it has determined that it has no personal jurisdiction over FIFA.

■■■ The court finds that the motions must be GRANTED. Under negligence principles, a person generally has no duty to protect another from harm in the absence of a special relationship or custody or control. *See Nally v. Grace Cmty. Church,* 47 Cal.3d 278, 293, 253 Cal.Rptr. 97, 763 P.2d 948 (1988). However, under California law, a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of the undertaking if (1) the volunteer's failure to exercise such care increases the risk of harm to the other person, or if (2) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result. *See Delgado v. Trax Bar and Grill,* 36 Cal.4th 224, 249, 30 Cal.Rptr.3d 145, 113 P.3d 1159 (2005); *see also Rickley v. Goodfriend,* 212 Cal.App.4th 1136, 1156–57, 151 Cal.Rptr.3d 683 (2013) ("A defendant who enters upon an affirmative course of conduct affecting the interests of another is regarded as assuming a duty to act, and will be liable for negligent acts or omissions, because one who undertakes to do an act must do it with care.") (citations and quotations omitted); 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1060 ("A person not required to perform services for another may sometimes do so in a voluntary or gratuitous undertaking, and in that case, is under a duty to exercise due care in performance.") (citing cases).

■■■ The "Good Samaritan" rule is "firmly rooted in the common law of negligence." *Artiglio,* 18 Cal.4th at 613, 76 Cal.Rptr.2d 479, 957 P.2d 1313. "The foundational requirement of the [G]ood Samaritan rule is that in order for liability to be imposed upon the actor, he must specifically have undertaken to perform the task he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative duty to perform that undertaking carefully." *Id.* at 614–15, 76 Cal.Rptr.2d 479, 957 P.2d 1313 (quoting *Blessing v. United States,* 447 F.Supp. 1160, 1188–89 (E.D.Pa.1978)). The Good Samaritan law and the voluntary undertaking doctrine are premised on a limited duty. *Baker v. City of Los Angeles,* 188 Cal.App.3d 902, 907, 233 Cal.Rptr. 760 (1986) ("The duty of a 'good Samaritan' is limited. Once he has performed his voluntary act he is not required to continue to render aid indefinitely.").

#### i. US Soccer

■■■ B.A., D.A., I.A., Akka–Seidel, and L.L.M. assert claims against U.S. Soccer. They allege, based on statements on U.S. Soccer's website, that U.S. Soccer "has knowledge of consensus best practices." *See* Cplt ¶ 261. They also assert that U.S. Soccer has created a "Concussion Management Program" to provide education, evaluation, and management of concussions among "national team players;" and a "Concussion Testing and Management

Process," which includes baseline testing, emergency evaluation of athletes, procedures for field evaluation and removal of players from participation if a concussion is suspected, post-concussion neurological tests, and a graded return-to-play protocol. Cplt ¶ 263. They contend that U.S. Soccer has failed to adopt the consensus guidelines promulgated by the "International Conferences on Concussion in Sport," which appear to incorporate most if not all of the practices and procedures U.S. Soccer has adopted as part of its Concussion Management Program. See Cplt ¶¶ 264–288.

US Soccer does not address the first and second causes of action separately, but instead argues that both causes of action should be dismissed because plaintiffs fail to plead facts showing that it breached a duty it owed to them. More particularly, U.S. Soccer argues that it had no legal duty to enforce the recommendations in the Consensus Statements or to change the Laws of the Game or restrict heading, and that it did not assume such a duty. US Soccer points to the allegation in the second cause of action that it "voluntarily assumed a duty toward [p]laintiffs and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury to the players," Cplt ¶ 435, but argues that broad statements and generalizations about U.S. Soccer's role in the sport and references to its enforcement of the Laws of the Game are not enough to establish a voluntary undertaking. US Soccer also argues that plaintiffs' claim is barred by the doctrine of primary assumption of the risk.

In opposition, plaintiffs point to allegations in the complaint that U.S. Soccer has a duty to take measures to prevent concussions or limit their effects, arising from its role as the "governing body of soccer in all its forms in the United States," see Cplt ¶¶ 20, 22; and that U.S. Soccer breached this duty by failing to mandate its Concussion Management Program beyond elite athletes to all participants, failing to mandate return-to-play protocols, failing to implement best practices in managing concussions in children under 13 and baseline testing at all levels, and failing to require proper on-site medical personnel to manage concussions, see Cplt ¶¶ 264–268, 272–283. Plaintiffs assert that because U.S. Soccer has undertaken broad responsibility for setting and enforcing the Laws of the Game, and because it has the power to direct and influence how the rest of the defendants treat concussion management issues, it assumed a duty to protect plaintiffs and the members of the class.

The court finds that the facts as alleged are insufficient to support a claim of voluntary undertaking against U.S. Soccer. In creating a "Concussion Management Program" for national team players, U.S. Soccer did not voluntarily assume a duty to adopt or enforce the consensus guidelines drafted by the various International Conferences on Concussion in Sport, or to change the Laws of the Game or other unspecified rules relating to any aspect of the game. Plaintiffs have identified no facts in their opposition that support a claim that U.S. Soccer has specifically undertaken to take actions to eliminate risks inherent in the sport of soccer or to reduce the risk of injury from improper concussion management.

### ii. USYSA

 Mehr, R.K.I., and Akka–Seidel assert claims against USYSA. They allege, based on USYSA's adoption of a "Concussion Procedure and Protocol" for its U.S. Youth Soccer National Championship Series, that USYSA "has knowledge of consensus best practices." Cplt ¶ 289–290. They also assert that USYSA failed to adopt any consensus guidelines (including its own protocol) for members or tourna-

ments other than the Championship Series tournament—and for that tournament, fails to adopt the consensus guidelines (such as baseline testing, emergency evaluation of athletes, procedures for field evaluation and removal of players from participation if a concussion is suspected, post-concussion neurological tests, and a graded return-to-play protocol)—and at most, simply provides informational links on its website. Cplt ¶¶ 291–316. They allege that USYSA's failure to implement or require various consensus best practices for concussion management of children and adolescents "is in contravention of best practices." Cplt ¶ 317.

USYSA argues that plaintiffs cannot establish that it assumed a duty to implement and enforce recommendations contained in the consensus statements, and that, as argued by U.S. Soccer, plaintiffs assumed a risk of injury by continuing to play soccer, thereby precluding any legal duty on the part of USYSA to prevent such risks. USYSA notes that under *Artiglio,* the defendant must specifically have undertaken to perform the task he/she/it is charged with having performed negligently, and that without such a voluntary assumption of the undertaking, there can be no correlative duty to perform that undertaking carefully. USYSA also argues that plaintiffs have failed to plead any facts showing that it is the proximate cause of any injuries suffered by plaintiffs relating to concussion management.

In opposition, plaintiffs contend that the complaint adequately alleges that USYSA has undertaken "broad responsibility in setting and enforcing the Laws of the Game," and that it performed this duty negligently, by "failing to educate" players and parents about concussion symptoms, by "failing to warn" of the harm that might result from repeated concussions, by "failing to disclose" the risks of long-term complications from repeated concussions,

by "concealing and misrepresenting pertinent facts" regarding concussions. *See* Cplt ¶ 439. As for USYSA's argument regarding proximate cause, plaintiffs contend that this argument is "fact-based" and "speculative," and should be disregarded. They claim that USYSA has not pointed to any "public policy" that would shield it from liability for its "negligence."

The court finds that the facts as alleged are insufficient to support a claim of voluntary undertaking against USYSA. Plaintiffs have identified no facts in their opposition that support a claim that USYSA has specifically undertaken to take actions to eliminate risks inherent in the sport of soccer or to reduce the risk of injury from improper concussion management. Nor have plaintiffs identified facts showing that USYSA specifically assumed an obligation to change the Laws of the Game or other unspecified rules pertaining to the game, or to restrict heading.

### iii. AYSO

Mehr, B.A., D.A., I.A., and L.L.M. assert claims against AYSO. Plaintiffs allege that prior to 2009, AYSO failed to adopt any of the consensus guidelines drafted by the International Conferences on Concussion in Sport (including return-to-play guidelines, prohibition on return-to-play after sustaining a concussion, and providing education of athletes, colleagues, those working with athletes, and the general public). Cplt ¶ 318. They allege further that in 2009, AYSO implemented a "national policy statement" regarding concussion awareness and safety, and also partnered with the CDC to create a Concussion Action Plan for coaches. Cplt ¶¶ 319–321. However, they assert that AYSO's Concussion Action Plan remains deficient because it fails to adopt the consensus "best practices" of the International Conferences. Cplt ¶¶ 322–342. They allege that AYSO's failure to implement or

require various consensus best practices for concussion management of children and adolescents is "in contravention of best practices." Cplt ¶ 343.

AYSO contends that plaintiffs' claims fail for lack of duty, although it does not address the first and second causes of action separately. Citing to U.S. Soccer's motion, AYSO asserts that a defendant owes no duty to a plaintiff who is allegedly injured as a result of a risk inherent in a sporting activity, and that here, plaintiffs have pled no facts showing that it owed them any legal duty to minimize risks that are inherent in the sport (such as risks of injury from heading) or to implement concussion management protocols. AYSO does not specifically argue that plaintiffs have not alleged facts showing that it assumed a duty to enforce the recommendations in the concussion statements or to limit risks inherent in the sport of soccer. However, AYSO does join in U.S. Soccer's motion to dismiss. AYSO also asserts that all members of the class who participated in its events have expressly released it from liability by signing a player registration form under which the player "voluntarily and willingly assumes all risks" of physical injury.

In opposition, plaintiffs contend that the alleged releases do not immunize AYSO from liability, because the existence of any releases and whether they were actually signed by the plaintiffs or their parents is a factual issue, and because the legal effect of any releases in the various states at issue is unknown. They also assert that AYSO has provided no other basis for dismissal, and refer to their response to U.S. Soccer's motion with regard to assumption of the risk and lack of duty.

The court finds that the facts as alleged are insufficient to support a claim of voluntary undertaking against AYSO. Plaintiffs have identified no facts in their opposition that support a claim that AYSO has specif-

ically undertaken to adopt or implement the consensus guidelines drafted by the International Conferences on Sport, or to take actions to eliminate risks inherent in the sport of soccer or to reduce the risk of injury from improper concussion management. Nor have plaintiffs identified facts showing that AYSO specifically assumed an obligation to change the Laws of the Game or any other unspecified rules pertaining to the game, or to restrict heading.

### iv. US Club Soccer

 Only Mehr asserts claims against U.S. Club Soccer. She alleges that U.S. Club Soccer has failed to adopt any consensus guidelines promulgated by the International Conferences on Concussion in Sport; and that at most, its website references a link to its concussion guidelines and provides links to informational materials, but there is no evidence that it implements or enforces U.S. Soccer's concussion guidelines. Cplt ¶¶ 344347. She asserts that U.S. Club Soccer's failure to require, implement, or enforce any consensus best practices is a "clear breach of its duty and commitment to provide 'a safe environment for its Members and participants.'" Cplt ¶ 348.

US Club Soccer argues that plaintiffs' claims fail for lack of duty, although it does not address the first and second causes of action separately. Citing to U.S. Soccer's motion, U.S. Club Soccer asserts that a defendant owes no duty to a plaintiff who is allegedly injured as a result of a risk inherent in a sporting activity, and that here, plaintiffs have alleged no facts showing that it owed them any legal duty to minimize risks that are inherent in the sport (such as risks of injury from heading) or to implement concussion management protocols. US Club Soccer does not specifically argue that plaintiffs have not alleged facts showing that it assumed a duty to enforce the recommendations in

the Consensus Statements or to limit risks inherent in the sport of soccer. However, U.S. Club Soccer does join in U.S. Soccer's motion to dismiss. US Club Soccer also asserts that all members of the class who participated in its events have expressly released it from liability by signing a player registration form under which the player "voluntarily and willingly assumes all risks" of physical injury.

In opposition, plaintiffs contend that the alleged releases do not immunize AYSO from liability, because the existence of any releases and whether they were actually signed by the plaintiffs or their parents is a factual issue, and because the legal effect of any releases in the various states at issue is unknown. They also assert that AYSO has provided no other basis for dismissal, and refer to their response to U.S. Soccer's motion with regard to assumption of the risk and lack of duty.

The court finds that the facts as alleged are insufficient to support a claim of voluntary undertaking against U.S. Club Soccer. Plaintiffs have identified no facts in their opposition that support a claim that U.S. Club Soccer has specifically undertaken to adopt or implement the consensus guidelines drafted by the International Conferences on Sport, or to take any specific action to eliminate risks inherent in the sport or to reduce the risk of injury from improper concussion management. Nor have plaintiffs identified facts showing that U.S. Club Soccer specifically assumed an obligation to change the Laws of the Game or other unspecified rules pertaining to the game, or to restrict heading.

### c. Medical monitoring

In the third cause of action for medical monitoring, plaintiffs allege that the members of an undefined "Medical Monitoring Class" have been "exposed to a greater risk of concussions and sub-concussions, which have created an increased risk of longterm injury and illnesses as described [in the complaint]." Cplt ¶ 446. They assert that each defendant "should be required to establish a medical monitoring program" that includes establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current, and future FIFA athletes, as frequently and appropriately as necessary; notifying all "Medical Monitoring Class" members in writing that they may require frequent medical monitoring; and providing information to treating team physicians to aid them in detecting concussions or sub-concussions and to assist them in determining when the athlete is subjected to an increased risk of harm. Cplt ¶ 450.

Plaintiffs bring this claim "under the laws of the states in which they reside" and assert claims on behalf of "the Medical Monitoring Class" under unspecified "laws of the states in which class members reside." Since no class has yet been certified, and plaintiffs' complaint provides not a clue as to which states' laws might be implicated, the court looks only at the three states in which the named plaintiffs are alleged to reside—California, Illinois, and Colorado.[3]

Defendants contend that none of the states in which the plaintiffs reside recognizes an independent cause of action for medical monitoring. They contend that

---

**3.** Soccer is likely played in most if not all states of the United States. Thus, even were the proposed class to be limited to the United States (which is not apparent from the overly-broad definition in the complaint), a "medical monitoring" subclass would be required for the players in each state among the minority of states where "medical monitoring" is recognized as a standalone cause of action. Numerous courts have denied certification of medical monitoring classes or subclasses for just this reason. *See In re St. Jude Medical, Inc.,* 425 F.3d 1116, 1122 (8th Cir.2005) (citing cases from 6th, 9th, and 10th Circuits).

the California Supreme Court has affirmatively rejected the concept, and that the highest courts of Illinois and Colorado have taken no position on the issue.

In opposition, plaintiffs assert that there is no "rule" that a cause of action has to be acknowledged by a state supreme court before it can be asserted in a complaint. They argue that that they can assert a stand-alone cause of action for "medical monitoring," but also state that they agree that a reasonably certain need for medical monitoring is "an item of damage for which compensation should be allowed," when liability is established under traditional tort theories of liability. They claim that it is "a distinction without a difference for present purposes, at the pleading stage."

■ The motions are GRANTED. First, California has affirmatively rejected the concept. *See Lockheed Martin Corp. v. Superior Court*, 29 Cal.4th 1096, 1105, 131 Cal.Rptr.2d 1, 63 P.3d 913 (2003). "Recognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort. It is simply a compensable item of damage when liability is established under traditional tort theories of recovery." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 1006–07, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993); *see also Xavier v. Philip Morris USA, Inc.*, 2010 WL 3956860, at *3–4 (N.D.Cal. Oct. 8, 2010) (under California law, "medical monitoring is a remedy which must rely on underlying claims," not a stand-alone tort claim).

Second, neither the Illinois Supreme Court nor the Colorado Supreme Court has addressed the issue. Lower courts in Illinois have suggested that the Illinois

Supreme Court might recognize an independent claim for medical monitoring even in cases where there is no present physical injury. *See, e.g., Jensen v. Bayer AG*, 371 Ill.App.3d 682, 308 Ill.Dec. 888, 862 N.E.2d 1091, 1100 (2007). However, to date, it does not appear that the Illinois Supreme Court has done so. In Colorado, a federal district court indicated that even assuming the Colorado Supreme Court would recognize a tort claim for individualized medical monitoring, the court did not believe that the Colorado Supreme Court would recognize a claim for the generalized surveillance studies sought by the plaintiffs in the case before it—"medical monitoring and surveillance services for the alleged 'increased risk of contracting serious illnesses.' " *See Satsky v. Paramount Commc'ns, Inc.*, 1996 WL 1062376, at *5 (D.Colo. March 13, 1996). This type of claim for "enhanced risk of future harm," *see id.*, is similar to what plaintiffs are seeking here.

Plaintiffs can still include their request for medical monitoring in the prayer for relief, assuming they can allege facts sufficient to establish standing.

## CONCLUSION

In accordance with the foregoing, defendants' motions are GRANTED.

1. FIFA's motion to dismiss for lack of personal jurisdiction is GRANTED. Because the court finds that amendment would be futile, FIFA is dismissed from the action WITH PREJUDICE.

2.—Having dismissed FIFA for lack of personal jurisdiction, the court finds it unnecessary to rule on FIFA's motion to dismiss for failure to join IFAB, a necessary party.[4] U.S. Soccer, USYSA, and

4. Under Federal Rule of Civil Procedure Rule 12(b)(7), the court can dismiss an action if the plaintiff has failed to join a "required" party under Rule 19. *See* Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial*

(2015 ed.) § 9:162. The failure to join a party under Rule 19 will lead to dismissal of a suit where the court cannot obtain jurisdiction over the necessary party and that party is determined to be indispensable to the action.

CYSA joined in FIFA's motion, but in the absence of both FIFA and IFAB, no claim can be maintained which seeks to change the FIFA Laws of the Game.

3. FIFA's alternative motion to compel arbitration is DENIED.

4. Defendants' motions to dismiss the complaint for lack of standing are GRANTED. The dismissal is with leave to amend, but only to the extent that plaintiffs can allege—as to each plaintiff and each defendant—specific facts supporting the elements of standing (injury, causation, redressability). Further, the motions to dismiss the claims for relief for lack of standing are GRANTED. The dismissal is with leave to amend, with the exception of the claims for prospective injunctive relief brought by the plaintiffs who are no longer eligible to play youth soccer (to date—Mehr, Akka–Seidel, and L.L.M.)

5. Defendants' motions to dismiss for failure to state a claim are GRANTED as follows:

a. CYSA's motion is GRANTED, on the basis that no plaintiff asserts a claim against CYSA. The dismissal is WITH LEAVE TO AMEND, but only to the extent that there is a California plaintiff who has standing to assert a claim against CYSA.

b. The motions of U.S. Soccer, USYSA, AYSO, and U.S. Club Soccer to dismiss the first cause of action for negligence are GRANTED. The dismissal is WITH LEAVE TO AMEND, but only to the extent that plaintiffs can allege some legally cognizable duty, and can allege facts showing that each defendant breached that duty, and caused injury to a particular plaintiff.

c. The motions of U.S. Soccer, USYSA, AYSO, and U.S. Club Soccer to

dismiss the second cause of action for voluntary undertaking are GRANTED. The dismissal is WITH LEAVE TO AMEND, but only to the extent that plaintiffs can allege facts as to each defendant showing that the defendant voluntarily assumed a duty with respect to a specific plaintiff or plaintiffs.

d. The motions to dismiss the third cause of action for medical monitoring are GRANTED. As the court finds that amendment would be futile, the dismissal is WITH PREJUDICE.

6. Any amended complaint shall be filed no later than August 17, 2015. No new claims or new parties may be added without leave of court.

**IT IS SO ORDERED.**

See Fed.R.Civ.P. 19(a); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 867 n. 5 (9th Cir.2004); *see also* *Shermoen v. United States,* 982 F.2d 1312, 1317 (9th Cir.1992); *Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir.1990).